IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON
http://www.ohsb.uscourts.gov/

IN RE:                               :
                                     :        Case No. 14-33677
       WILLIAM M. APOSTELOS          :        Chapter 7
                                     :        Judge Lawrence S. Walter
                   Debtor.           :

**MOTION OF TRUSTEE FOR AN ORDER PURSUANT TO  11 U.S.C. §§ 105, 541  AND 542, AND BANKRUPTCY RULES,  AUTHORIZING AND/OR REQUIRING IMMEDIATE:**

**(1)     TURNOVER FROM ALL ENTITIES OF ALL BANK  AND OTHER FINANCIAL ACCOUNTS IN THE NAME OF THE DEBTOR AND/OR  OVER WHICH DEBTOR HAS OR  HAS  HAD  SIGNATURE  AUTHORITY  (INCLUDING  JOINT  AND  BUSINESS ACCOUNTS); AND**

**(2)     TURNOVER  FROM ALL ENTITIES OF ALL OTHER PERSONAL PROPERTY IN THE NAME OF THE DEBTOR (INCLUDING JOINTLY OWNED AND BUSINESS PROPERTY); AND**

**(3)     TURNOVER  OF  ALL  RECORDS,  COMPUTER  DATA  AND  ALL  OTHER DOCUMENTS IN THE POSSESSION, CUSTODY OR CONTROL OF ANY PERSON THAT REFER, RELATE OR PERTAIN TO THE DEBTOR, OR THE DEBTOR'S AFFILIATES, OR TO THEIR PROPERTY OR FINANCIAL AFFAIRS; AND**

**(4)     ISSUANCE BY THE TRUSTEE OF SUBPOENAS TO ANY PERSON  PURSUANT TO F.R.B.P. RULE 9016 AND AUTHORIZING THE TRUSTEE TO CONDUCT RULE 2004 EXAMINATIONS  OF  ANY  PERSON   PURSUANT  TO  SUCH  SUBPOENAS,  AND AUTHORIZING TRUSTEE TO PAY COSTS ASSOCIATED WITH SUCH SUBPOENAS AND 2004 EXAMINATIONS.**

**NOTICE TO ALL CREDITORS AND PARTIES IN INTEREST**

**You are hereby notified** that the Trustee has filed papers with the Court requesting an Order pursuant to the above referenced Motion, Application and/or Objection (hereinafter called the "Trustee's Motion").

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the Court to grant the Trustee's Motion, or if you want the Court to consider your views on the Trustee's Motion, <u>then on or before **Eleven (11)** days from the Date of Issuance set</u>

<u>forth below,</u> you or your attorney must file a written response in accordance with the Court's local rules and filing procedures.

The Clerk of Court's address is: U.S. Bankruptcy Court Clerks Office, 120 W. Third Street, Dayton, OH 45402.

Copies of the Court's Administrative Procedures for electronic court filings can be found at the following website: http://www.ohsb.uscourts.gov

You must file the response early enough so the Court will **receive** it on or before the date stated above.

You must also provide a copy of your response to John Paul Rieser. You may either electronically serve John Paul Rieser through the court's ECF System or mail a copy to the following address: John Paul Rieser, Trustee, 7925 Graceland St., Dayton, OH 45459-3834.

If you or your attorney do not take these steps, the Court may decide that you do not oppose  the relief sought in the Trustee's Motion and may enter an order granting that relief.

<u>November 18, 2014</u>                              <u>*/s/ John Paul Rieser*</u>
Date of Issuance                               John Paul Rieser, Esq.

## <u>MOTION</u>

**NOW COMES** John Paul Rieser, the duly acting Chapter 7 Trustee of the Debtor in the above-captioned case (the "Trustee"),  by and through counsel, and pursuant to 11 U.S.C. §§ 105, 541  and 542, and Bankruptcy  Rules, including without limitation FRBP 9014 and LBR 9073-1, respectfully moves this Court for an Order on an expedited basis, authorizing and/or requiring immediate: (1) turnover to the Trustee from all entities of all bank and other financial accounts in the name of William Apostelos ("Debtor") or over which Debtor has or has had signature authority (including joint and business accounts); and (2) turnover to the Trustee from all entities of all other personal property in the name of the Debtor (including jointly owned and business property); and (3) turnover to the Trustee of all records, computer or electronic data, and all other documents in the possession, custody or control of any person that refer, relate or pertain to the Debtor or the Debtor's affiliates, or to their property or financial affairs; and  (4)  issuance by the Trustee of subpoenas to any person or business entity pursuant to F.R.B.P. Rule  9016 and authorizing the Trustee to conduct Rule 2004 examinations of any person or business entity pursuant to such subpoenas, and authorizing the Trustee to pay costs associated with the issuance of subpoenas and 2004 examinations in an amount up to Ten Thousand Dollars ($10,000.00) without further Court order.

A Memorandum in Support, and an Affidavit of the Trustee (Exhibit "A") are submitted herewith.

Respectfully submitted,

*/s/ John Paul Rieser*

_____

John Paul Rieser (0017850)
Case Attorney for John Paul Rieser, Trustee
Rieser & Marx LLC, Of Counsel
7925 Graceland Street
Dayton, OH 45459-3834
Telephone: (937) 224-4128, Fax: (937) 224-3090
E-mail: attyecfdesk@riesermarx.com

## <u>MEMORANDUM IN SUPPORT</u>

1.      On or about October 15, 2014, an involuntary Chapter 7 case was filed by the petitioning creditors. There are allegations of fraudulent and criminal activity surrounding the Debtor's pre-petition activities (see the Forfeiture Complaint filed in the United States District Court on November 3, 2014, attached hereto as Exhibit "B"). The movant herein, John Paul Rieser is the duly appointed and acting Chapter 7 Bankruptcy Trustee of the Debtor herein.

2.      There is an ongoing criminal investigation into the Debtor's pre-petition activities. The investigation is in its early stages and no charges have been filed yet. However, the affidavit attached to the Forfeiture Complaint indicates that over $32,000,000.00 went through the Debtor's main business account between November 2012 and May 2014 (Paragraph 46 in the Affidavit). The Trustee has been advised that there may be hundreds of victims of the Debtor's alleged fraudulent Ponzi scheme.

3.      Bankruptcy schedules have not been filed yet, and the Trustee cannot rely on the Debtor to be fully forthcoming or cooperative given the criminal investigation. The Trustee will need to obtain records from parties other than the Debtor in order to carry out his investigatory and

collection activities on behalf of the creditors of this estate, particularly as to pre-petition or undisclosed matters.

4.      Under the extreme facts and circumstances of these cases, the Trustee seeks authority and Court Orders necessary to carry out his fiduciary duties under the Code–and to make up in part for the Debtor's anticipated failure to perform his duties to turn over property of the estate and recorded information.  There are four specific items requested by this Motion–all of which go to the Trustee's statutory duties. The Orders sought are continuing, and take account of the fact that events will continue to develop at a fast rate in this case. They are also fair and in accordance with explicit provisions of the Code, namely Sections 541 and 542.  Finally, the requested Orders carefully balance the rights of third parties with the need for turnover of property of the estate and recorded information about the Debtor, on behalf of creditors in a case rife with fraud and deception. Each of the four requested Orders is discussed below.

5.      The first two numbered branches of the Motion seek Orders that permit the Trustee, upon discovery of any accounts or personal property belonging to the Debtor, in whole or in part, to compel turnover of such property. The first two Orders requested flow directly from Code Sections 541 and 542. This request includes turnover of accounts titled in the name(s) of the Debtor and/or affiliated business entities. Code Sections 105, as well as 541 and 542, grant the Court authority to allow seizure of accounts where it is consistent with notions of "property of the estate" not being limited to mere legal title, but also to asset held in the name(s) of affiliated entities, given the unique facts of this case–where badges of fraud abound, and numerous disclosed and undisclosed entities and persons are the recipients of over $32,000,000.00 in missing and unaccounted for funds. As detailed in the Forfeiture Complaint, the Debtor used a variety of people and entities to conduct his activities, and as such the Debtor's business entities must be included in the Order. The position

of innocent third parties is protected, since the Order in case of seizure of joint accounts or accounts in the names of affiliated third parties requires immediate notice by the Trustee to such persons or entities if and when accounts are seized, and an opportunity for an immediate hearing on five (5) days written request. Absent such an Order, it is likely that funds will continue to be transferred–one entity to another, in the click of a mouse, or at the speed of a wire transfer–and the missing monies will never be found in time to permit recovery by defrauded creditors.  Surely the "any and all orders necessary" language of Section 105 and the explicit turnover directives of 541 and 542 are broad enough to fashion a remedial turnover Order such as the one sought, which is both consistent with due process and that does not put the estate at a disadvantage in dealing with the Debtor and affiliates who have a demonstrated history and pattern and practice of using co-mingled funds, and ignoring "labels" such as account names to transact their affairs–which have, whether criminal or not, left millions of dollars in claims.

6.      Items 3 and 4 request Orders requiring turnover to the Trustee by any person of all records and recorded information about the Debtor or his affiliates, or any of their respective property or financial affairs upon request by the Trustee, and seek authority under Rule 2004 to issue subpoenas under Rule 9016 and to conduct examinations. These provisions are fully in keeping with the Code and Rules.  These are sought by the Trustee on a wholesale basis, without specification of all persons from whom discovery is sought, because the sheer multitude of persons who may have this information is not known to the Trustee, but grows daily. There is also the point that the Trustee hopes to uncover still more assets, and forcing the Trustee to move for 2004 rights and an Order in each case (after a notice) would only alert the Debtor or those who would seek to again conceal or transfer assets to keep ahead of the Trustee.  Furthermore, given the FBI's seizure of records, it may also be some time before all of these can be released to the Trustee, necessitating reliance on third

Rieser & Marx LLC • 7925 Graceland Street, Dayton, OH 45459-3834 • 937/224-4128

party records as of yet unidentified parties and assets. Again, due process concerns of any and all persons served with the Trustee's subpoenas are fully protected, since under Civ Rule 45(c), which applies to any Trustee subpoena issued under FRBP Rule 9016, any party can move for a protective order at any time if it believes that privilege or some other ground (e.g. abusive requests by the Trustee) render the requested discovery inappropriate. These branches of the requested Order are doubly critical here, given on-going concealment, as well as a seizure of records by federal prosecutors that leave the Trustee with no option but to seek this information from third parties.

7.      The bankruptcy estate has no funds at the present time. However, the Trustee requests authority to pay costs associated with subpoenas and 2004 examinations, if and when the bankruptcy estate has funds to pay for such expenditures. These costs include, without limitation: fees charged by third parties for production of documents pursuant to subpoena, process server fees, court filing fees, court reporter fees, and 2004 examination transcripts. (However, this request does not include the Trustee's attorney fees, which compensation must be approved by separate fee application.) The Trustee requests authority to pay expenditures associated with subpoenas and 2004 examinations without further Court Order, up to the total amount of Ten Thousand Dollars ($10,000.00). The purpose of this request is to ensure that bills are timely paid without the administrative burden and expense of filing a separate Motion to pay each invoice, and to relieve the Trustee–as much as possible–from the burden of advancing initial discovery costs.

8.      An Affidavit in support of this Motion is filed herewith. It supports the statements made herein.

**WHEREFORE** the Trustee respectfully requests an Order in the premises.

**Rieser & Marx LLC • 7925 Graceland Street, Dayton, OH 45459-3834 • 937/224-4128**

Respectfully submitted,

*/s/ John Paul Rieser*

_____

John Paul Rieser (0017850)
Case Attorney for John Paul Rieser, Trustee
Rieser & Marx LLC, Of Counsel
7925 Graceland Street
Dayton, OH 45459-3834
Telephone: (937) 224-4128, Fax: (937) 224-3090
E-mail: attyecfdesk@riesermarx.com


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **MOTION OF TRUSTEE FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 541 AND 542, AND BANKRUPTCY RULES** was served this **18th** day of November, 2014, on the parties in interest listed below, by either U.S. regular mail, postage prepaid, or by the Court's electronic ECF noticing system. **To reduce mailing costs, the Motion and Exhibit A are being served by regular mail, but Exhibit B (the Forfeiture Complaint) is not being served to the parties on the regular mail list.**

The following parties were served by U.S. regular mail, postage prepaid:

William M. Apostelos
35 Commercial Way
Springboro, OH 45066


Connie Apostelos
35 Commercial Way
Springboro, OH 45066


Also served at:
William M. Apostelos
8895 Tanglewood Drive
Springboro, OH 45066


Connie Apostelos
8895 Tanglewood Drive
Springboro, OH 45066

**Rieser & Marx LLC • 7925 Graceland Street, Dayton, OH 45459-3834 • 937/224-4128**

Dwight Brannon, Esq.
130 W. Second Street, Suite 900
Dayton, OH 45402

The following parties were served by the Court's electronic ECF noticing system:

    Asst US Trustee (Day) USTPRegion09.CB.ECF@usdoj.gov

    David C Barrett dbarrett@ohiocounsel.com, smorrison@farmlawyers.com;

    pslong@farmlawyers.com; astacy@farmlawyers.com; kkwilhelmy@farmlawyers.com

    Robert G Hanseman rhanseman@ssdlaw.com, kroeckner@ssdlaw.com

    Ronna Govan Jackson Ronna.G.Jackson@usdoj.gov

*/s/ John Paul Rieser*

_____

John Paul Rieser [smw/701]

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON
http://www.ohsb.uscourts.gov/

| | | |
|---|---|---|
| IN RE: | : | |
| | | Case No. 14-33677 |
| WILLIAM M. APOSTELOS | : | Chapter 7 |
| | | Judge Lawrence S. Walter |
| Debtor. | : | |

_____

**AFFIDAVIT OF JOHN PAUL RIESER, CHAPTER 7 TRUSTEE,
IN SUPPORT OF MOTION OF TRUSTEE FOR AN ORDER PURSUANT TO  11 U.S.C.
§§ 105, 541  AND 542**

| | |
|---|---|
| STATE OF OHIO | ) |
| | )  SS: |
| COUNTY OF MONTGOMERY | ) |

**NOW COMES** John Paul Rieser, the duly acting Chapter 7 Trustee of the Debtor in the above-captioned case (the "Trustee" or "Affiant"), and, after being first duly cautioned and sworn, deposes and states as follows:

1.      I am the duly appointed and acting Trustee of the Debtor in the above-referenced case.  I make these statements in support of the Motion referenced above, which are either from personal knowledge, or from information supplied to me from various sources.

2.      The statements made in the Memorandum In Support are true and correct to the best of my knowledge and belief.

3.      Without immediate action by the Court as requested in the Motion, the estate will likely suffer irreparable harm, through the non-turnover of assets and records, or the loss or destruction or continuing concealment or withholding of same.

4.      It is expected that the Debtor in this case will not fully cooperate with the Trustee as required in turning over all assets of the estate and recorded information. The basis for such expectation is the pending federal criminal investigation against the Debtor, as well as the seizure by federal authorities of the Debtor's business records.

5.      Code Sections 541 and 542, inter alia, grant the Trustee an immediate right to turnover of all property of the estate and of all recorded information relating to the Debtor (subject in the case of attorneys or accountants, only to any applicable privilege).  Unfortunately, given the criminal investigation, the Trustee cannot obtain such property or records from the Debtor, and other

1

EXHIBIT A

parties with such information may have a reluctance to produce same, given the ongoing criminal investigation and allegations of fraud, without a subpoena or court order.

6.      There is  a continuing and substantial risk of loss to the estate if the Trustee is not granted the powers requested in the Motion.

7.      Further Affiant saith naught.


                                        */s/ John Paul Rieser*

                                        _____
                                        John Paul Rieser


**Sworn to** and subscribed before me by the said John Paul Rieser, Chapter 7 Trustee for William Apostelos, this 17th day of November, 2014.



                                        */s/ Sarah M. White*

                                        _____
                                        Notary Public
                                        [Seal]
                                        Sarah M. White, Notary Public
                                        In and for the State of Ohio
                                        My Commission Expires Jan. 29, 2018

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:14CV381 |
| Plaintiff, | : | |
| v. | : | |
| (1) REAL PROPERTY KNOWN AS 35 COMMERCIAL WAY SPRINGBORO, OHIO 45066, | : | JURY DEMAND |
| and | : | |
| (2) REAL PROPERTY KNOWN AS 496 SOUTH HOUSTON PIKE SOUTH VIENNA, OHIO 45369, | : | |
| Defendants. | : | |

## <u>VERIFIED COMPLAINT FOR FORFEITURE</u>

Now comes the Plaintiff, United States of America, by and through its undersigned

attorney, Pamela M. Stanek, Assistant United States Attorney, and respectfully states as follows:

## <u>NATURE OF THE ACTION</u>

1.    This is a civil action <u>in rem</u> brought to enforce the provisions of Titles

18 U.S.C. § 981(a)(1)(A) and (C).

2.    Plaintiff is the United States of America.

EXHIBIT B

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over an action commenced by the United States

pursuant to 28 U.S.C. § 1345, and over an action for forfeiture pursuant to 28 U.S.C. § 1355.

4.    Venue for a civil forfeiture action, pursuant to 28 U.S.C. § 1355(b)(1), lies in:

(a) the district court for the district in which any of the acts or omissions giving
rise to the forfeiture occurred, or

(b) any other district where venue for the forfeiture action or proceeding is
specifically provided for in section 1395 of this title or any other statute.

5.    Title 28 U.S.C. § 1395 provides for venue in forfeiture actions as follows:

(a) A civil proceeding for the recovery of a pecuniary fine, penalty or forfeiture
may be prosecuted in the district where it accrues or the defendant is found;

(b) A civil proceeding for the forfeiture of property may be prosecuted in any
district where such property is found; and

(c) A civil proceeding for the forfeiture of property seized outside any judicial
district may be prosecuted in any district into which the property is brought.

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because one or

more of the acts or omissions giving rise to the forfeiture occurred within this district; and pursuant

to 28 U.S.C. § 1395(a) because the basis for the forfeiture of the Defendant Real Properties

accrued in this district and 28 U.S.C. § 1395 (b) because one or more of the Defendant Real

Properties may be found in this district.

## THE DEFENDANTS *IN REM*

7.    The first defendant Real Property (hereinafter "Defendant One") is all right, title

and interest (including any leasehold interest) in the whole of any lot or tract of land and any

appurtenances or improvements, to the Real Property commonly known as 35 Commercial Way,

Springboro, Ohio 45066, having the following legal description:

Situated in the City of Springboro, Warren County, Ohio and being part of Lot 1, Springboro Commercial Park (Plat Book 31, Pages 83 and 84) and part of a 0.872 acre tract in Section 19, Town 2, Range 5, and being more particularly described as follows:

Beginning at an iron pin found at the northwest corner of Lot 1, Springboro Commercial Park, said pin also being in the southerly right-of-way line of Commercial Way (60' right-of-way); thence along said right-of-way and with the northerly line of said Lot 1, the following three (3) courses and distances:

(1) N 59 19' 48" E. a distance of 44.27 feet;

(2) Along a curve to the right having a radius of 170.00 feet and an arc length of 85.02 feet, the chord of said curve bears N. 73 39' 26" E. a distance of 84.14 feet;

(3) N 87 59' 05" E. a distance of 158.24 feet to a 5/8" iron pin set in a new division line;

Thence leaving said right-of-way line and along said new division line, S 06 39' 20" W. a distance of 161.05 feet to a 5/8" iron pin set in the northerly line of Viola Hatfield (O.R. 441, Page 805); thence along said northerly line, N 83 20' 40" W. a distance of 210.00 feet to an iron pin found at the southwesterly corner of the aforementioned Lot 1; thence along the westerly line of said Lot 1, N 30 40' 12" W. a distance of 97.44 feet to the Point of Beginning.

Containing 0.778 acres more or less and being subject to all easements, restrictions and rights-of-way of record.

The above description is based upon a field survey by R.W. Consultants, Inc., Engineers and Surveyors, Middletown, Ohio, Kenneth R. Combs, Ohio Professional Surveyor No. 7311 and is recorded in Volume 102, Page 49 of the Warren County Engineer's Record of Land Surveys.

Except taxes and assessments, if any, now a lien.

Address: 35 Commercial Way, Springboro, Ohio, 45066
Parcel No.: 04-19-126-008

Prior Instrument Reference: Book 5714, Page 708 of the Warren County Recorder Deed Records.

Subject to and together with all easements, restrictions and legal
highways, if any, of record.

8.      Defendant One is titled in the name of Coleman Capital, Inc.

9.      There are no liens of record filed against Defendant One.

10.     The second defendant real property (hereinafter "Defendant Two") is all right, title
and interest (including any leasehold interest) in the whole of any lot or tract of land and any
appurtenances or improvements to the Real Property commonly known as 496 South Houston
Pike, South Vienna, Ohio 45369, consisting of approximately 168. having the legal description set
forth in "Exhibit B", which is hereby incorporated by reference.

11.     Defendant Two is titled in the name of Steven C. Scudder, Trustee of the WMA
Trust Agreement dated the 23rd day of July 2013.   On September 22, 2014 an Appointment of
Successor Trustee was recorded with the Clark County Recorder at Book 2037, Page 1013.   The
Successor Trustee to the WMA Trust is David Zoellner.

12.     There are no liens of record filed against Defendant Two.

13.     Defendant Two has a Right-of-Way and Easement granted to AT&T that is
recorded at Book 2033 Page 1287, and such Right of Way and Easement has the legal description
set forth in "Exhibit C" which is hereby incorporated by reference.

14.     Defendant One and Defendant Two (hereinafter "Defendant Real Properties") have
not been seized by the United States; but are located within the district and/or within the
jurisdiction of the Court.

15.     Administrative forfeiture was not initiated against the Defendant Real Properties.

## FACTS

16.     The attached Affidavit and Verification of Complaint, including but not limited to paragraphs 1 through 68, is hereby incorporated by reference and made a part of this Complaint.

17.     The attached Affidavit and Verification of Complaint, including but not limited to paragraphs 1 through 68, sets forth facts to support the United States' allegation that the Defendant Real Properties are forfeitable pursuant to 18 U.S.C. §§ 981(a)(1)(A) and/or (C).

### FIRST CLAIM FOR RELIEF

18.     Pursuant to 18 U.S.C. § 981(a)(1)(A) any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property is subject to forfeiture.

19.     By reason of the facts set forth in the attached Affidavit and Verification of Complaint, including but not limited to paragraphs 1 through 68, the Defendant Real Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as properties which were involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 and/or 18 U.S.C. § 1957, or are property traceable to such property.

### SECOND CLAIM FOR RELIEF

20.     Pursuant to 18 U.S.C. § 981(a)(1)(C) any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" (as defined in Section 1956(c)(7) of this title), or a conspiracy to commit such offense is subject to forfeiture.

21.     Title 18 U.S.C. § 1956(c)(7) defines specified unlawful activity as a violation of a multitude of federal offenses, including violations of 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1956 and 18 U.S.C. §1957 (Money Laundering).

22.     By reason of the facts set forth in the attached Affidavit and Verification of Complaint, including but not limited to paragraphs 1 through 68, the Defendant Real Properties are subject to forfeiture pursuant to 18 U.S.C. §981(a)(1)(C) as properties which constitute or are derived from proceeds traceable to a violation of 18 U.S.C. § 1343(Wire Fraud); 18 U.S.C. § 1956 and/or 18 U.S.C. §1957 (Monetary Laundering).

WHEREFORE, the Plaintiff, United States of America, respectfully prays that:

1.      The forfeiture of the Defendant Real Properties to the United States of America be confirmed, enforced and ordered by this Honorable Court, and that the United States be thereafter ordered to dispose of the Defendant Real Properties as provided by law;

2.      Because the United States will post notice of this Complaint on the Defendant Real Properties, pursuant to 18 U.S. C. § 985(c)(3), it is not necessary for the Court to issue a Warrant of Arrest *In Rem*, or take any other action to establish in rem jurisdiction over the Defendant Real Properties; and

3.     The Court award Plaintiff all other and further relief to which it is entitled.

JURY DEMAND

The United States requests a trial by jury.

Respectfully submitted,

CARTER M. STEWART
United States Attorney

s/Pamela M. Stanek
PAMELA M. STANEK (0030155)
Assistant United States Attorney
600 Federal Building
200 West Second Street
Dayton, Ohio 45402
(937) 225-2910
pamela.stanek@usdoj.gov

**VERIFICATION AND AFFIDAVIT IN SUPPORT OF COMPLAINT**

I, Michael Bush, being duly sworn, depose and state:

## I. INTRODUCTION

1.      I have been a Special Agent with the Federal Bureau of Investigation for over twenty-four years.  I am currently assigned to the Dayton Resident Agency of the Cincinnati Field Division.  In connection with my official duties, I investigate violations of Federal criminal laws, to include white collar crime matters, which include offenses involving fraud by wire (18 U.S.C. §1343), money laundering (18 U.S.C. §1956 and 1957), and conspiracy to commit such violations   (18 U.S.C. §1349). I have participated in the execution of numerous search and seizure warrants. These warrants have included the search of businesses and residences of individuals involved with fraudulent schemes including wire fraud, embezzlement, money laundering and tax evasion.  I have also received additional specialized training in money laundering and asset forfeiture.

2.      Based on my training, experience and participation in financial investigations, and based upon the experience and knowledge of other agents and officers of the Southern Ohio Electronic and Financial Crimes Task Force, who were involved with this investigation from its onset, I know that individuals who receive funds from a particular crime:

        a.      will attempt to legitimize the proceeds of the crime by depositing the funds into bank accounts in nominee names. These individuals will often launder the funds through these nominee bank accounts in an attempt to further conceal the disposition of the funds.

        b.      will attempt to conceal the disposition of these funds by purchasing personal assets with cash.  These individuals use, control and maintain these assets in their residences and will maintain receipts from these assets in their residences.  These documents include car titles and deeds.

        c.      it is common practice for such persons to hide their assets, their addresses, and their telephone services by using other people's names in order to avoid discovery by law enforcement officials;

        d.      it is common practice that such persons utilize vehicles registered to witting and unwitting associates as a means of evading the detection of law enforcement;

        e.      it is common practice that such persons maintain residences which are used as stash houses or locations for narcotics storage and distribution as well as use nominees to obtain telephone service, utility service, et cetera, at these locations;

f.     it is common practice for such persons to conceal proceeds of their illegal activities, assets purchased with proceeds of those activities, records of those activities, and other items, at locations within their residence(s), business(s), vehicle(s), financial institutions and other locations deemed only accessible to the individual, to include safe deposit boxes, strong boxes, and safes;

g.     it is common practice that such persons conceal in their residence(s), business(s), and other secure locations, narcotics, large amounts of U.S. currency, financial instruments, jewelry, automobile titles, and other items of value and/or proceeds of their illegal activities and transactions and evidence of financial transactions relating to the acquisition and concealment of large sums acquired through illegal activities;

h.     it is common practice that, when such persons amass large proceeds from illegal activities, they attempt to legitimize (launder) these profits through the use of financial institutions, financial instruments, real estate investment, and purported legitimate business fronts;

i.     it is common practice that such persons take, or cause to be taken, photographs of themselves, their associates, their property, and their product, and that the photographs are usually maintained at the residence(s), business(s), or other safe locations;

j.     If an individual has removed bulk currency from a bank, it tends to come banded (i.e., in a money strap or band).  After removing money from the bank, the individual often retains the band on the currency until the currency is accessed;

k.     In the modern era, people bank online, conduct transactions online, make travel arrangements, access to overseas banks and check credit card statements on line; and

l.     When individuals embezzle money, particularly in the form of US currency, they are unlikely to deposit all of it into bank accounts for fear of alerting authorities.  As such, cash embezzlers often keep bulk currency at their residence, in safes, vehicles, etc.

3.     This investigation is being worked jointly with the IRS-CI, wherein Special Agent (SA) Laurel Vant is the co-case agent.  SA Vant is experienced in the investigation of possible violations of the Internal Revenue Laws (including Title 26 U.S.C. §7201), the Bank Secrecy Act (Title 31 U.S.C. §§5311, 5316, 5322, 5324 and 5331), the Money Laundering Control Act (18 U.S.C. §§1956 and 1957), and related offenses.

4.    Based on my training, experience and participation in other financial investigations, and based upon the experience and knowledge of agents of the IRS-CI and FBI, who were involved with this investigation from its onset, I also know:

    a.  A pyramid scheme is structured like a pyramid with the initial recruiter and investor(s) at the apex of the pyramid. Additional people are recruited to "invest" typically with promises of large, and sometimes, a guaranteed return on their investment. These additional investors are deceived into believing that by investing money, they will make more money.  However, no wealth has been created, no product has been sold, no investment has been made, and no service has been provided.  Instead, the money invested by the additional investors is used to pay the initial investor(s). Ultimately, the Ponzi scheme will fail because the fraudster runs out of people who can be deceived into joining the scheme. The fraud lies in the fact that it is impossible for the cycle to sustain itself.  The investors will eventually lose their money somewhere down the line.  The most vulnerable people are those toward the bottom of the pyramid.  Toward the bottom of the pyramid it becomes impossible to recruit enough new investors as is required to pay off the previous layer of investors.

    b.  Typical characteristics of a pyramid scheme include: (1) promises of large rates of return on investment and (2) investment funds being immediately sent out to pay prior investors and not to a legitimate investment.

5.    This affidavit is intended to include facts to support the forfeiture of the Defendant Real Properties and does not purport to set forth all of my knowledge of, or investigation into, this matter. The facts and information contained in this affidavit are based on, among other things, my personal knowledge, my training and experience, as well as my conversation with various witnesses, including law enforcement personnel who have participated in this investigation, and the review of certain documents and records.  Most notably, this affidavit does not set forth every transaction conducted in this case.

## II.  VERIFICATION OF COMPLAINT

6.    I have carefully read the Verified Complaint for Forfeiture to which this Affidavit is attached and hereby verify that the facts stated therein are true and correct.

7.    Based on my training and experience, the statements of witnesses, and information and insight given to me by other law enforcement personnel, to include special agents of the Internal Revenue Service, Criminal Investigation ("IRS-CI"),

a.     I submit there is probable cause to believe that the following individuals:

(1)     WILLIAM M. APOSTELOS;



(2)     CONNIE M. APOSTELOS aka CONNIE COLEMAN (WILLIAM APOSTELOS' wife);



(3)    SCOTT DOAK, (a physician who was reprimanded by the State Medical Board, but has never lost his license) who served as a corporate officer and/or incorporator of several companies controlled by WILLIAM APOSTELOS, to include, Innovesting, Inc., The Banyon Group, Inc., and OVO WEALTH MANAGEMENT, LLC.  The OVO WEALTH MANAGEMENT, LLC, Amended Business Plan for TD Ameritrade, stated:  "Mr. Doak is a majority owner, Chief Executive Officer, and President.  He also is a close friend of Mr. Apostelos and his path to OVO Wealth Management, LLC was quite different.  He is an accomplished scientist, physician, and educator who is entering the investment and finance industry as a second career…. Throughout his medical career he remained fascinated by the investment industry.  More recently this has grown into a passion fueled by the stark contrast of the remarkable success of his personal investments as compared to the rather pedestrian choices and returns he found as a private physician.  By 2012 he had obtained Series 65 certification and, under William's expert tutelage, had secured his financial future as well.  He has now retired from medicine to pursue a second career in the investment industry….); and



SCOTT A. DOAK

(4)    REBEKAH FAIRCHILD (who has been introduced to victims as WILLIAM APOSTELOS' sister); and



REBEKAH ELECTRA FAIRCHILD

b.      the following entities:

(1)      APOSTELOS ENTERPRISES INC., formerly known as CARMEN-COLEMAN, INC., an Ohio corporation established in April of 2005 with authorized representatives CONNIE COLEMAN and WILLIAM APOTELOS, having the purpose of "Residential Construction and Remodeling";

(2)      COLEMAN CAPITAL, INC., an Ohio corporation established in May of 2008, with authorized representative CONNIE COLEMAN, having the purpose of "various business and administrattive (sic) consulting activities and services";

(3)      MIDWEST GREEN RESOURCES, LLC an Ohio limited liability company established in August of 2009, having the purpose of "investment and asset management" with authorized representatives including WILLIAM APOSTELOS, DAVID ZOELLNER, THOMAS M. TAGGART, and COLEMAN CAPITAL, INC. with CONNIE APOSTELOS signing on behalf of COLEMAN CAPITAL;

(4)      WMA ENTERPRISES, LLC an Ohio limited liability company established on October 16, 2009 with agent WILLIAM APOSTELOS, having the purpose of "Investment and Real Estate Asset Management";

(5)      SILVER BRIDLE RACING, LLC an Ohio limited liability company established in August of 2011, with agent CONNIE APOSTELOS, having the purpose of "thoroughbred horse racing business"; and

(6)      OVO WEALTH MANAGEMENT, LLC an Ohio limited liability company registered on February 21, 2013, with agent COLEMAN CAPITAL, INC., having the purpose of "Investment";

have been involved in a scheme to defraud investors and have committed wire fraud and/or money laundering.

### III. PURPOSE OF AFFIDAVIT

8.     I make this affidavit in support of:

a.     the forfeiture of the following assets:

(1)     All right title and interest (including any leasehold interest) in the whole of any lot or tract of land and any improvements or appurtenances, to the real property commonly known as **35 Commercial Way, Springboro, Ohio**, pictured below, having the legal description set forth in Paragraph 7 of the Complaint.





(2)    All right title and interest (including any leasehold interest) in the whole of any lot or tract of land and any improvements or appurtenances, to the real property commonly known as **496 South Houston Pike, South Vienna Ohio**, pictured below, having the legal description attached to the Complaint as Exhibit B.



b.    as there is probable cause to believe WILLIAM M. APOSTELOS, CONNIE M. APOSTELOS, REBEKAH FAIRCHILD, SCOTT DOAK and others committed the following violations:

(1)  18 U.S.C. § 1343 (Wire Fraud);

(2)  18 U.S.C. § 371 (Conspiracy);

(3)  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud);

(4)  18 U.S.C. § 1956 (Money Laundering);

(5)  18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and

(6)  18 U.S.C. § 1957 (Laundering Monetary Instruments in Excess of $10,000).

c.      and the assets listed in paragraph 8(a) above, are subject to forfeiture pursuant to:

(1)  18 U.S.C. § 981(a)(1)(C)(civil forfeiture) as property, real or personal which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (Wire Fraud) or any offense constituting "specified unlawful activity" ("SUA") as defined in 18 U.S.C. § 1956(c)(7) which includes 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (Laundering SUA Proceeds in Excess of $10,000.00); or a conspiracy to commit such offense (18 U.S.C. § 1349, 18 U.S.C. § 371);  and/or

(2)  18 U.S.C. § 981(a)(1)(A)(civil forfeiture) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957, or any property traceable to such property.

## IV. VIOLATIONS

## SUMMARY OF INVESTIGATION

9.      As further detailed below, your Affiant's investigation along with other agents from the IRS-CI and the FBI reveals that WILLIAM APOSTELOS and others have been conducting a pyramid scheme during the past several years.  WILLIAM APOSTELOS has created several business entities to assist with the pyramid scheme, has opened several bank accounts used to facilitate obtaining and transferring the proceeds of the scheme, and for at least the past five years has lived on the proceeds obtained from defrauded investors.  Since 2010, all of the business entities affiliated with WILLIAM APOSTELOS have reported very little income and more often significant losses.  Thus, your Affiant's investigation has revealed that WILLIAM APOSTELOS and his wife CONNIE APOSTELOS have had no legitimate source of income since 2010.  Their sole source of income has been stolen from the funds investors unknowingly placed into the pyramid scheme.  Those stolen investor funds have allowed WILLIAM APOSTELOS and CONNIE APOSTELOS to live glamourous lives, driving luxury vehicles such as the 2012 Lexus LS 460 and the 2008 BMW M3 convertible, all the while spending as much as $35,000.00 per month for their horse racing hobby.

10.     The unknowing investors in the pyramid scheme include over 160 individuals from the greater Dayton Ohio area.  Many of the investors have invested their retirement savings and will have no chance of recovering those investments.  These investors include local business persons, professionals, and even some retired police officers.

11.     During the period of November 2012 through May of 2014, SA Vant's analysis indicates that over $32,000,000.00 was deposited in accounts controlled by WILLIAM M. APOSTELOS. An estimated $28,000,000.00 was transferred to prior investors.

12.    During the period of November 2012 through May 2014, over $1,900,000.00 was transferred into other bank accounts controlled by WILLIAM M. APOSTELOS.  Those accounts included accounts in the name of: APOSTELOS ENTERPRISES INC.; COLEMAN CAPITAL INC.; MIDWEST GREEN RESOURCES, LLC; SILVER BRIDLE RACING, LLC. and OVO WEALTH MANAGEMENT LLC.

13.    In addition, during this same time period, withdrawals in the amount of over $737,000.00 were made; including cash withdrawals and funds converted into cashier's checks.

## Wire Fraud (18 U.S.C. § 1343)

14.    Your Affiant's investigation has revealed that APOSTELOS enticed investors to send him money with false promises as to how he would invest these funds and the rates of return that would be repaid for those investments.  APOSTELOS typically gives the investors a promissory note for each amount invested and guarantees a rate of return ranging from 10% and 20%.  The promissory notes are typically signed by WILLIAM APOSTELOS in his individual name or by WMA ENTERPRISES, LLC.  REBEKAH FAIRCHILD, APOSTELOS' sister, notarizes the promissory notes.

15.    APOSTELOS used the business entities as follows in the scheme:

    a.    **APOSTELOS ENTERPRISES, INC.:**

        (1) established in April 2005;

        (2) agents CONNIE COLEMAN and WILLIAM APOSTELOS;

        (3) having the purpose of "Residential Construction and Remodeling";

        (4) opened PNC Account #8071 in the name of APOSTELOS ENTERPRISES, LLC, on April 23, 2010 with WILLIAM APOSTELOS and CONNIE APOSTELOS signing as members;

        (5) added REBEKAH FAIRCHILD as a signor on June 30, 2010;

        (6) funding for this account is generally from transfers from PNC Account #8143 in the name of  WMA ENTERPRISES LLC;

        (7) pays expenses for WMA business including accounting services, payroll, landscaping, and utilities;

        (8) occasionally pays for some of the race horse expenses

        (9) occasionally pays for personal expenses of WILLIAM APOSTELOS and CONNIE APOSTELOS;

(10) occasionally pays some expenses for WILLIAM APOSTELOS and CONNIE APOSTELOS' rental properties;

(11) filed Forms 1120 U.S. Corporate Income Tax Return for the years 2010, 2011 and 2012; and

(12) reported negative taxable income as follows:

-$363,525.00 in taxable income in 2010;
-$246,780.00 in taxable income in 2011; and
-$78,331.00 in taxable income in 2012.

b. **COLEMAN CAPITAL, INC.:**

(1) established in May of 2008;

(2) authorized representative CONNIE COLEMAN;

(3) having the purpose of "various business and administrattive (sic) consulting activities and services";

(4) opened PNC Account #8119 in the name of COLEMAN CAPITAL, INC. on May 26, 2010 with CONNIE APOSTELOS signing as President;

(5) added REBEKAH FAIRCHILD as a signor on June 30, 2010;

(6) funding for the account is generally from transfers from PNC Account #8143 in the name of WMA ENTERPRISES LLC;

(7) used to pay expenses for WMA business including accounting services, payroll, landscaping and utilities;

(8) occasionally pays for some of the race horse expenses;

(9) occasionally pays for some personal expenses;

(10) filed Forms 1120, U.S. Corporate Income Tax Return for the years 2010, 2011 and 2012;

(11) reported negative taxable income as follows:

-$104,910 for 2010;
-$161,244 for 2011; and
-$216,133 for 2012.

c.    **MIDWEST GREEN RESOURCES, LLC:**

(1) established in August of 2009;

(2) agents WILLIAM APOSTELOS and DAVID ZOELLNER on the original appointment, changing on February 11, 2010 to THOMAS M. TAGGART, and on November 12, 2013 changing to COLEMAN CAPITAL, INC. with CONNIE APOSTELOS signing;

(3) having the purpose of "investment and asset management";

(4) opened PNC Account #8135 in the name of MIDWEST GREEN RESOURCES, LLC was opened on May 3, 2010 with WILLIAM APOSTELOS signing as a member;

(5) added REBEKAH FAIRCHILD as a signor on June 30, 2010;

(6) funding for this account is from checks and wires from investors;

(7) funds are sometimes transferred to the PNC Account #8143 in the name of WMA ENTERPRISES LLC ;

(8) filed Forms 1065, U.S. Return of Partnership Income for the years 2010, 2011 and 2012;

(9) reported negative taxable income as follows:

-$81,116 in 2010;
-$115,069 in 2011; and
-$138,070 for 2012.

d.    **WMA ENTERPRISES, LLC:**

(1) established on October 16, 2009;

(2) agent WILLIAM APOSTELOS;

(3) having the purpose of "Investment and Real Estate Asset Management";

(4) opened PNC Account #8143 in the name of WMA ENTERPRISES, LLC, on May 3, 2010 with WILLIAM APOSTELOS signing as a member;

(5) added REBEKAH FAIRCHILD as a signor on June 30, 2010;

(6) used this account as the main account for receiving investor funds and paying investor funds;

(7) filed a Form 1065, U.S. Return of Partnership Income for the year 2010;

(8) reported taxable income of $0 in 2010;

e.    **SILVER BRIDLE RACING, LLC:**

(1) established in August of 2011;

(2) agent CONNIE APOSTELOS;

(3) having the purpose of "thoroughbred horse racing business";

(4) opened PNC Account #4464 in the name of SILVER BRIDLE RACING, LLC, on December 6, 2011 with CONNIE APOSTELOS signing as owner;

(5) REBEKAH FAIRCHILD signed as Admin;

(6) used to deposit horse racing winnings and expenses associated with training and maintaining thoroughbred race horses;

(7) reported as business/farm income on WILLIAM APOSTELOS and CONNIE APOSTELOS' 2011 and 2012 Forms 1040 Individual Income Tax Returns;

(8) reported adjusted gross income as follows:

$13,589.00 for 2010;
-$49,026 for 2011; and
$18,535 for 2012.

f.    **OVO WEALTH MANAGEMENT, LLC:**

(1) registered on February 21, 2013;

(2) agent COLEMAN CAPITAL, INC.;

(3) having the purpose of "Investment";

(4) required to file Form 1065, U.S. Return of Partnership Income;

(5) but has not filed a 2013 Form 1065.

16.     OVO WEALTH MANAGEMENT LLC had 4 principal officers.  According to the
Business Plan OVO WEALTH MANAGEMENT submitted to Ameritrade, WILLIAM
APOSTELOS was the Chief Investment Officer.  CONNIE APOSTELOS is mentioned as
WILLIAM APOSTELOS' "wife and business partner".  SCOTT DOAK was the Chief
Executive Officer and President.  STEVEN SCUDDER was the Chief Compliance Officer and
Secretary.  DAVE ZOELLNER was the Chief Operations Officer.  The plan states that these four
principal officers are "mature and successful professionals with impeccable reputations…."

17.     The OVO WEALTH MANAGEMENT business plan proposed that the principal officers
would market their business and trading models with "a level of transparency, sophistication and
performance that is literally unheard of by a large portion of the general population."  OVO
WEALTH MANAGEMENT planned to market to the following areas:

> *Our Principals will pursue their respective warm markets (above)
> in depth in the Dayton area with a focus on establishing networking
> contacts in surrounding cities.

> *The Ohio Police/Firefighter Deferred Retirement Option Program
> (DROP) program is an additional retirement fund last estimated in 2012 to
> involve over 4,000 retired workers totaling over 2 billion dollars.  These
> funds are transferrable IRA accounts earning approximately 1.5% fixed
> return at this time.  Several retired police solicitors are waiting to pursue
> this market on our behalf including … of the Ohio Police/Firefighter
> Retirement Association.

> …

> *Principals of OVO Wealth Management, LLC also have a long-
> term personal and professional relationship with one of the most
> prominent horse trainers in the Midwest who is located in Churchill
> Downs in Louisville, Kentucky.  This sought after and trusted trainer has
> agreed to act as a solicitor on our behalf as he interfaces daily with some
> of the wealthiest and most influential families in the region.

18.     Additional contacts highlighted in OVO WELATH MANAGEMENT's business plan
include a high ranking member of the Dayton Dental Society, the owner of a premier private jet
charter and sales company in the Dayton area, multiple auto dealers in the Dayton area including
a high ranking officer with the Dayton Auto Dealers Association.

19.    All of the above APOSTELOS business entities are located at 35 Commercial Way, Springboro, Ohio.





20.    WILLIAM APOSTELOS (hereinafter APOSTELOS) defrauded his victims by promising a high rate of return on their investments.  The following two victims are typical.

21.    Victim 1 started investing with APOSTELOS in August of 2013 with an initial investment of $250,000.  Victim 1 made additional investments of $70,000 on October 3, 2013 by wire and $75,000 on November 15, 2013 by wire. Victim 1 was told that his investments were going to a farm in South Vienna, OH that APOSTELOS was going to purchase and resell in a short time frame. Victim 1 was promised a rate of return of 15% by APOSTELOS.  Both of the later notes ($77,000 & $75,000) were paid off by APOSTELOS with interest ($7,000 and $15,000 respectively) in the fall of 2013; although the payments were several weeks late.

22.    Victim 1's initial $250,000 investment came due and was not paid.  APOSTELOS made various excuses and offered to "roll-over" the investment multiple times.  APOSTELOS' excuses included that his sister was in the hospital and that the bank made errors negotiating the funds.  APOSTELOS told Victim 1 in December of 2013 that the investment split, but has provided no additional documentation to Victim 1 concerning the investment.  Currently, APOSTELOS is claiming the value of Victim 1's initial investment is near $500,000.

23.    Victim 1 has repeatedly requested the return of his $250,000.  Victim 1 does not expect to receive any interest from his $250,000 investment.  He simply wants the principal returned. Victim 1 has received payments on the note including:

    a. on March 24, 2014 a $5,000 wire;
    b. on June 23, 2014 a $40,000 wire;
    c. on July 23, 2014 a $15,000 wire;
    d. on July 25 2014 a $15,000 wire; and
    e. on August 25, 2014 a $15,000 wire.

24.    Victim 1 told investigators that based on the high interest rates that APOSTELOS promised and the way that APOSTELOS conducted business, he believes that APOSTELOS is operating a pyramid scheme.

25.    On or about October 14, 2014, Victim 1 went to the office located at 35 Commercial Way, Springboro, OH in an attempt to collect more of his funds back from APOSTELOS. APOSTELOS did provide Victim 1 with a check drawn on Key Bank.  APOSTELOS brought Victim 1 through a key coded door to the basement of 35 Commercial Way, Springboro, OH.  In this space there were 6 desks with promissory notes and files covering the desks.  Victim 1 observed a server in this basement space.

26.    PNC Bank account #8143 in the name of WMA ENTERPRISES, LLC has been analyzed relating to the transfers made by Victim 1 into the WMA ENTERPRISES, LLC account and the subsequent wire transfers out of the WMA ENTERPRISES, LLC account.  In reviewing the checks and wires out of this account, SA Laurel Vant saw that within a few days of a deposit that appeared to be from an investor, payments almost always appeared to be made to other investors and not to a legitimate investment. SA Vant relayed the following:

a.    On August 22, 2013, Victim 1's check for $30,000.00 was deposited into the WMA ENTERPRISES, LLC account at PNC Bank.  On the same date, a check cleared that was drawn on the WMA ENTERPRISES, LLC account made payable to:

(1) LD in the amount of $20,000.00.

There are many payments going to LD within this account and LD appears to be an investor. Additionally two wire transfers were made out of the account to:

(1) PNC account in the name of COLEMAN CAPITAL for $3,700.00 and
(2) APOSTELOS ENTERPRISES at PNC for $200.00.

b.    On October 3, 2013, Victim 1 wire transferred $70,000 from his JP Morgan Chase account into the WMA ENTERPRISES LLC account at PNC Bank.  On the same date, there were wire transfers made out of the account to:

(1) JD for $200,000.00;
(2) RW for $137,280.00;
(3) TL for $20,000.00; and
(4) the Money Source (DAVID ZOELLNER)  for $15,000.00.

There are also several checks that cleared on October 3, 2013 including checks made payable to:

(1) IF for $25,000.00 and
(2) ML for $3,000.00.

c.    On November 15, 2013, Victim 1 wire transferred $75,000 from his JP Morgan Chase account into the WMA ENTERPRISES LLC account at PNC Bank.  On the same date, there were two wire transfers going out of the WMA ENTERPRISES LLC account to:

(1) JB#1 for $2,000.00;
(2) MK for $2,000.00; AND
(3) one large check in the amount of $190,000 cleared on November 15, 2013 that was made payable to Fifth Third Bank which is endorsed by TM.

27.    Victim 2 met with APOSTELOS in January of 2014. Victim 2 was very impressed and decided to invest $100,000.00.  Victim 2 was told by APOSTELOS that the funds were being invested in stocks at "Ameritrade".  APOSTELOS provided Victim 2 with a promissory note. Victim 2 was told the investments were made in APOSTELOS' name; however, APOSTELOS told Victim 2 he could track his investment online through a purported "Ameritrade" website and his investment would be listed under the name "Mountaineer".

28.    When your Affiant contacted Victim 2, Victim 2 firmly believed that his initial investment was safe and had in fact matured after three months and was now worth $253,000 and consisted of stock in Ford, Microsoft and other investments.  Victim 2 believed his money was safely invested because he had logged into the purported "Ameritrade" Account under the

name Mountaineer as instructed by APOSTELOS, and could see his balance and his earnings sitting in the "Ameritrade" Account.

29.     Victim 2 provided your Affiant with the purported "Ameritrade" account website and login information.  Your Affiant logged into the account and found it to be a wholly owned subsidiary of "Ameritrade" called "InvesTools".   Your Affiant found over 25 accounts with varying balances.  "Mountaineer" is one of the names used on the account.

30.     Your Affiant contacted a representative with TD Ameritrade.  The TD Ameritrade representative said that the website that Victim 2 was logging into to track his investment was not a real account.  The account that Victim 2 was seeing was a training account program that can be purchased by subscription.  The training account tracks the real stock market.  Victim 2's account was only a "paper money" account meaning there is no real money in the account.

31.     In April of 2014, Victim 2 invested an additional $50,000.00 with APOSTELOS.  This investment was to go to an unnamed farm cooperative in Kentucky.  APOSTELOS indicated that the farm co-ops could not obtain bank loans to purchase equipment and seed to plant crops.  APOSTELOS advised that he would loan the money at a high interest rate and collect when the crops were harvested in the fall.  APOSTELOS promised a rate of return of 25%.  APOSTELOS told Victim 2 that these high rates were only available for a short period of time.

32.     In May of 2014, Victim 2 invested an additional $58,000.00 in APOSTELOS ENTERPRISES LLC.  In June of 2014, Victim 2 invested an additional $46,000.00 in APOSTELOS ENTERPRISES.  Victim 2 received separate promissory notes for each investment from APOSTELOS in person at 35 Commercial Way, Springboro, OH.

33.     In June of 2014, APOSTELOS gave Victim 2 a check for $48,600.00 which Victim 2 was able to negotiate.

34.     In July of 2014, APOSTELOS gave Victim 2 a check for $4,500.00.  Victim 2 called PNC and was told that there were not enough funds in the account to cover the check.  When Victim 2 called APOSTELOS about the lack of funds, APOSTELOS advised that it was a bank error.

35.     PNC Bank account #8143 in the name of WMA ENTERPRISES, LLC has been analyzed relating to the transfers made by Victim 2 into the WMA ENTERPRISES LLC account and the subsequent wire transfers out of this account.  The following transactions occurred:

        a.      On January 21, 2014, Victim 2's two checks were deposited, one in the amount of $60,000.00 and the other in the amount of $40,000.00, into the WMA ENTERPRISES LLC account at PNC Bank.  On the same date, a wire transfer was made to:

                (1) JT in the amount of $11,500.00.

Additionally checks cleared on this date from this account made payable to:

> (1) TP totaling $47,000.00;
> (2) JL in the amount of $10,000.00;
> (3) CD in the amount of $2,500.00; and
> (4) Steven Scudder in the amount of $2,500.00.

      b.      On May 1, 2014, Victim 2's check in the amount of $58,000.00 was deposited into the WMA ENTERPRISES LLC account at PNC Bank.  On the same date, a wire transfer was made to:

> (1) RS in the amount of $15,000.00.

Additionally checks cleared from this account on the same date made payable to:

> (1) Dl & DL in the amount of $11,811.00;
> (2) MB in the amount of $11,000.00; and
> (3) Fifth Third Bank / TM in the amount of $50,000.00.

      c.      On June 18, 2014, Victim 2's check in the amount of $30,000.00 was deposited into the WMA ENTERPRISES LLC account at PNC Bank.  On the same date, several wire transfers were made out of this account including to:

> (1) Victim 1 in the amount of $20,000.00;
> (2) ND in the amount of $11,515.00;
> (3) MV in the amount of $10,010.00, and
> (4) DT in the amount of $1,000.00.

Additionally, checks cleared from this account on the same date made payable to:

> (1) LS in the amount of $33,666.00,
> (2) P&LM in the amount of $12,500.00;
> (3) PD in the amount of $55,000.00; and
> (4) JB#2 in the amount of $33,666.00.

36.     On October 3, 2014, Victim 2 met with APOSTELOS in an attempt to get his money back.  The meeting occurred in APOSTELOS' office at 35 Commercial Way, Springboro, OH.  During this meeting, APOSTELOS mentioned that the investment plan had not gone the way that APOSTELOS had expected.  APOSTELOS said something to the effect that: the pyramid had crumbled. (Paraphrased.)

37.     TD Ameritrade was subpoenaed for APOSTELOS' stock transactions.  As of October 10, 2014, APOSTELOS had 15 accounts with balances totaling approximately $55,486.00.  The majority of the accounts are in the names of investors, but APOSTELOS has access to these accounts.

38.    TD Ameritrade also provided an Amended Business Plan that it had received from OVO WEALTH MANAGEMENT LLC.  The principals of OVO WEALTH MANAGEMENT LLC include WILLIAM APOSTELOS, SCOTT DOAK, STEVEN SCUDDER and DAVE ZOELLNER.  WILLIAM APOPSTELOS is the majority owner, Chief Investment Officer and Treasurer.  The plan states that:

> APOSTELOS began trading equities, options and commodities in 1984.  His trading skills and successes have not only provided him a comfortable and independent life, but are well known both locally and nationally through a loyal and broad network of clients, professionals and friends.  Mr. APOSTELOS' reputation and track record of carefully and profitably navigating bear market conditions over the years by remaining adaptable and anticipating changes will benefit OVO WEALTH MANAGMENT, LLC and its clients.

The plan goes on to speak about the target market and provides marketing and growth strategies.

39.    Your Affiant's investigation has revealed that at least 3 lawsuits were filed recently in Warren County seeking the repayment of money invested with APOSTELOS.  Details of these lawsuits are as follows:

a.    On May 23, 2014, Maximum Flight Advantages, LLC filed a complaint alleging that WILLIAM APOSTELOS executed and delivered to Maximum Flight Advantages, LLC a promissory note on November 13, 2012 in the principal amount of $367,000.00 and the defendant failed to pay on the note. The plaintiff demanded judgment in the amount of $280,000. The attorney for APOSTELOS confessed judgment in the amount of $280,000 and a judgment was entered in favor of the plaintiff, Maximum Flight Advantages, LLC, in the amount of $280,000.00.

b.    On June 23, 2014, Dave Dennis, Inc. and Jason J. Dennis filed a complaint against MIDWEST GREEN RESOPURCES, LLC, WILLIAM APOSTELOS and WMA ENTERPRISES, LLC alleging that two promissory notes were unpaid.  First, the complaint alleges that on August 1, 2012, MIDWEST GREEN RESOURCES, LLC executed and delivered a promissory note to Dave Dennis, Inc. in the amount of $1,000,000.00.  MIDWEST GREEN RESOURCES, LLC paid $500,000.00 in interest on August 22, 2013 and $300,000.00 in interest on October 8, 2013.  However, the note was in default and the principle of $1,000,000.00 plus accrued interest of $200,000.00 was owed to Dave Dennis.  Second, the complaint alleges that on October 10, 2013, APOSTELOS executed and delivered to Jason Dennis a promissory note for the principle sum of $1,100,000.00.  The complaint alleges that APOSTELOS is in default on this note and owes Jason Dennis the principle amount of $1,100,000.00 plus interest at the rate of 3% per annum.  A confession of judgment was filed by MIDWEST GREEN RESOURCES, LLC and by APOSTELOS on June 23, 2014.  Judgments were entered against MIDWEST GREEN RESOURCES, LLC and WILLIAM APOSTELOS for the amounts alleged in the complaint.

c.    On July 15, 2014, Christopher Heizer filed a complaint alleging that WILLIAM APOSTELOS executed and delivered to Christopher Heizer a cognitive promissory note on April 29, 2013 in the principal amount of $327,848.26 and the defendant failed to pay on the

note. The Plaintiff submitted an affidavit stating that on April 18, 2013, he wire transferred to WILLIAM APOSTELOS dba MIDWEST GREENE (sic) RESOURCES, $327,848.27, and that money was from an IRA and was to be invested by WILLIAM APOSTELOS. On August 21, 2013, APOSTELOS paid Heizer $50,000.00 and on December 19, 2013, APOSTELOS paid $5,000.00. The interest rate promised was 20%. The attorney for APOSTELOS confessed judgment for a total amount of $338,417.91 plus interest accrued after May 29, 2014 and a judgment entry was filed.

40.     The investigation has revealed that APOSTELOS kept QuickBooks and records detailing the amounts invested by all investors and the amounts paid to those investors. Records have also been obtained which document the story that APOSTELOS gave the investor regarding how the investor's money was being invested in "Ameritrade" and excuses made as to why the investor had not yet received the promised return on his or her investment.

41.     By convincing investors that the money would be invested and high rates of return were guaranteed, and using wire communications to obtain funds from investors and/or to transfer the funds to other investors or to other accounts controlled by WILLIAM APOSTELOS, WILLIAM APOSTELOS and others committed wire fraud and conspired to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349.

## MONEY LAUNDERING (18 U.S.C. § 1956 AND § 1957)

42.     Based on my training and experience, I know that individuals who receive funds from a particular crime will attempt to legitimize the proceeds of the crime, or conceal the nature, source, or ownership of the proceeds by depositing the funds into bank accounts in nominee names, or transfer the funds through one or more bank accounts in an attempt to further conceal the nature, source, or ownership of the funds.

43.     Further, transferring funds to prior investors disguised as interest payments using the funds of later investors to encourage further investment and thereby promote the pyramid scheme, and in order to conceal the nature, source, ownership or control of those funds is money laundering in violation of 18 U.S.C. § 1956.

44.     Spending or transferring the fraudulently obtained funds though financial transactions in amounts over $10,000 is money laundering in violation of 18 U.S.C. §§ 1957.

45.     IRS-CI Special Agent Laurel Vant analyzed the WMA ENTERPRISES, LLC Account #8143 for the period of November 2012 through May of 2014 and determined that this was the main account into which the investor funds were deposited and out of which funds were paid back to earlier investors in the pyramid scheme.

46.    During the period of November 2012 through May of 2014, approximately one year and seven months:

      a.    over $32,000,000.00 went through this account;

      b.    of the $32,000,000.00 deposited into the account, an estimated $21,000,000.00 was deposits from investors;

      c.    over $3,700,000.00 was deposited from known investment companies;

      d.    over $616,000.00 in cash was deposited into the account;

      e.    an estimated $28,000,000.00 was sent back to prior investors;

      f.    over $1,900,000.00 was transferred into other bank accounts that WILLIAM and CONNIE APOSTELOS controlled including APOSTELOS ENTERPRISES INC., OVO WEALTH MANAGEMENT LLC, COLEMAN CAPITAL INC., MIDWEST GREEN RESOURCES, LLC and SILVER BRIDLE RACING, LLC; and

      g.    withdrawals totaling over $737,000.00 were made; including cash withdrawals and funds converted into cashier's checks.

## WILLIAM APOSTELOS' and CONNIE APOSTELOS' REPORTED INCOME

47.    IRS-CI Special Agent Laurel Vant reviewed the tax returns filed by WILLIAM and CONNIE APOSTELOS, the returns filed by the businesses controlled by APOSTELOS and the bank accounts controlled by APOSTELOS and determined that the majority of the money obtained by APOSTELOS, CONNIE APOSTELOS and the business entities they controlled were the proceeds of various pyramid schemes.  None of the businesses appeared to be legitimate, nor were they profitable.  APOSTELOS lost money on his investments. APOSTELOS lost money gambling.  APOSTELOS lost money racing horses.  APOSTELOS lost money with his rental properties.  Virtually everything WILLIAM and CONNIE APOSTELOS acquired came from the proceeds of the defrauded investors.

48.    WILLIAM and CONNIE APOSTELOS filed Forms 1040, Individual Income Tax returns for the years 2010, 2011 and 2012.  They obtained an extension for the 2013 tax year that was due on October 15, 2014.

49.    On their 2010 Form 1040, WILLIAM and CONNIE APOSTELOS had a total adjusted gross income of $13,589.00.  This adjusted gross income comes from:

      a.    CONNIE reported wages from APOSTELOS ENTERPRISES, INC. in the amount of $41,589.00;

b.      capital losses from stock sales of -$1,475,120.00, which were limited to a $3,000.00 loss; and

c.      losses totaling $25,000.00 from three rental properties.

50.    On their 2011 Form 1040, WILLIAM and CONNIE APOSTELOS had a negative adjusted gross income of -$49,026.00.  This adjusted gross income comes from:

a.      CONNIE reported wages from APOSTELOS ENTERPRISES, INC. in the amount of $41,316.00;

b.       interest income in the amount of $41.00 from TD Ameritrade and Blackstone Group;

c.      dividends totaling $6,591.00 from TD Ameritrade and Blackstone Group;

d.      zero profit from the horse racing/breeding business with income of $377,285.00 negated by the Cost of Goods Sold and Expenses in the amount of $377,285.00;

e.      capital losses from stock sales of -$1,830,246.00 which were limited to a $3,000.00 loss;

f.      losses totaling $25,000 from three rental properties; and

g.      losses from gambling in the amount of $68,974.

51.    On their 2012 Form 1040, WILLIAM and CONNIE APOSTELOS report an adjusted gross income of $18,535.00.  This adjusted gross income comes from:

a.      CONNIE reported wages from COLEMAN CAPITAL, INC. in the amount of $54,835.00;

b.      CONNIE reported wages from APOSTELOS ENTERPRISES in the amount of $3,176.00;

c.      interest income in the amount of $13.00;

d.      dividends totaling $23.00;

e.      capital losses from stock sales of -$1,303,904.00, which were limited to a $3,000.00 loss;

f.      losses totaling $25,000.00 from three rental properties;

g.      a loss for the business called SILVER BRIDLE, LLC, described as Racing Breeding, in the amount of $76,799.00;

h.      a loss for the sale of business property in the amount of $129,419.00 which was for the sale of a rental property and a horse; and

i.      a gain from gambling in the amount of $205,720.00.

## PNC BANK ACCOUNTS

52.     SA Laurel Vant also reviewed the bank account records for the accounts held by WILLIAM APOSTELOS, CONNIE APOSTELOS, REBEKAH FAIRCHILD, and the businesses they controlled.  Those accounts included the following:

a.      Personal Accounts of WILLIAM and CONNIE APOSTELOS:

(1)     **PNC Account #9058** in the names of WILLIAM APOSTELOS, CONNIE APOSTELOS and REBAKAH FAIRCHILD, opened on May 3, 2010 with WILLIAM APOSTELOS and CONNIE APOSTELOS listed as signors on the account.  REBEKAH FAIRCHILD was added as a signor on July 13, 2010; and

(2)     **PNC Account #9299** in the names of WILLIAM APOSTELOS, CONNIE APOSTELOS and REBEKAH FAIRCHILD, opened on May 3, 2010 with WILLIAM APOSTELOS and CONNIE APOSTELOS listed as signors on the account.  REBEKAH FAIRCHILD was added as a signor on July 13, 2010.

b.      APOSTELOS ENTRPRISES, INC.:

(1)     **PNC Account #8071** in the name of APOSTELOS ENTERPRISES, INC., opened on April 23, 2010 with WILLIAM and CONNIE APOSTELOS signing as members. REBEKAH FAIRCHILD was added as a signor on June 30, 2010;

(2)     **PNC Account #8098** in the name of APOSTELOS ENTERPRISES, INC., Tax Account, opened on April 23, 2010 with WILLIAM and CONNIE APOSTELOS signing as members.  REBEKAH FAIRCHILD was added as a signor on June 30, 2010.

c.      COLEMAN CAPITAL, INC.:

(1)     **PNC Account #8119** in the name of COLEMAN CAPITAL, INC., opened on May 26, 2010 with CONNIE APOSTELOS signing as President.  REBEKAH FAIRCHILD was added as a signor on June 30, 2010.

d.      MIDWEST GREEN RESOURCES, LLC

(1)     **PNC Account #8135** in the name of MIDWEST GREEN RESOURCES, LLC opened on May 3, 2010 with WILLIAM APOSTELOS signing as a member.  REBEKAH FAIRCHILD was added as a signor on June 30, 2010; and

(2)      **PNC Account #8127** in the name of MIDWEST GREEN RESOURCES, LLC Escrow Account, opened on April 26, 2010 with WILLIAM APOSTELOS signing as CEO. REBEKAH FAIRCHILD was added as a signor on June 30, 2010.

e.      WMA ENTERPRISES, LLC:

(1)      **PNC Account #8143** in the name of WMA ENTERPRISES, LLC, opened on May 3, 2010 with WILLIAM APOSTELOS signing as a member. REBEKAH FAIRCHILD was added as a signor on June 30, 2010.

f.      SILVER BRIDLE RACING, LLC:

(1)      **PNC Account #4464** in the name of SILVER BRIDLE RACING, LLC, opened on December 6, 2011 with CONNIE APOSTELOS signing as owner and REBEKAH FAIRCHILD signing as Admin.

53.      The deposits into WILLIAM and CONNIE APOSTELOS' personal bank accounts above and the assets purchased are grossly inconsistent with the large losses listed on their tax returns and the tax returns of the entities that they are associated with for the years 2010-2012. Based on a review of the above bank accounts, it appears that WILLIAM and CONNIE APOSTELOS lost money with their rental properties, lost money with their thoroughbred racing, and lost money investing. The only source of money appears to be money deposited by investors.

54.      WILLIAM and CONNIE APOSTELOS live off the funds withdrawn from the WMA ENTERPRISES, LLC Account and were deposited into their personal PNC Account #9058. These funds were not reflected on their tax returns. However, the cash deposits made into the personal accounts were traced to cash withdrawals on the same date from the WMA Enterprises PNC Account #8143. The total amount of cash and check transfers from the WMA account to the APOSTELOS' personal accounts was:

(1)      $187,750 in 2010;
(2)      $485,100 in 2011; and
(3)      $110,300 in 2012.

55.      In early October 2014, PNC closed all the accounts associated with the APOSTELOS due to the appearance of suspicious activity in the accounts.

**ASSETS:**

56.    Despite the meager income reported by the APOSTELOS, and the significant losses suffered by their businesses, the APOSTELOS have acquired significant assets including:

a.    **BANK ACCOUNTS**

(1)    **Key Bank Account #9796** in the name of WMA ENTERPRISES, LLC with WILLIAM APOSTELOS and REBEKAH FAIRCHILD as the signors.  The Key Bank accounts were opened in approximately June of 2014.  There was not a lot of activity in the Key Bank accounts until approximately September 2014.  Key Bank Account #9676 now appears to be the main business account where investor funds are deposited. From September 22, 2014 to October 21, 2014, a total of approximately $2,100,000.00 was wire transferred into Key Bank Account #9676.  The majority of the $2,100,000.00 appears to be from investors.  Again, the activity in the Key Bank Accounts shows that as soon as the investor money comes in, it is wired back out to other apparent investors. Between September 22, 2014 and October 21, 2014, approximately $890,000.00 was wired out of Key Bank Account #9676 to individuals that appear to be investors.  A large wire was received into Key Bank Account #9676 on October 23, 2014 in the amount of $850,000.00.  The source of this wire is currently unknown.

(2)    **Key Bank Account #9788** in the name of MIDWEST GREEN RESOURCES LLC with WILLIAM APOSTELOS and REBEKAH FAIRCHILD as the signors;

(3)    **J.P. Morgan Chase Bank Account #****8300** in the names of WILLIAM M. APOSTELOS or CONNIE M. APOSTELOS;

(4)    **J.P. Morgan Chase Bank Account #****1858** in the name of APOSTELOS ENTERPRISES, INC.;

(5)    **KeyBank account #1028** in the name of CONNIE APOSTELOS (all remaining contents);

(6)    **KeyBank Account #9960** in the name of COLEMAN CAPITAL INC., (all remaining contents);

(7)    **KeyBank Account #9978** in the name of COLEMAN CAPITOL INC.(all remaining contents);

(8)    **U.S. Bank Account #2934** in the name of SILVER BRIDLE RACING, LLC (all remaining contents)

(9)    **U.S. Bank Account #3007** in the name of SILVER BRIDLE RACING, LLC, (all remaining contents);

(10)    **U.S. Bank Account #4687** in the name of CONNIE APOSTELOS (all remaining contents);

b.    <u>**REAL ESTATE**</u>

(1) **35 Commercial Way, Springboro Ohio for $319,000.00;**



(A) According to records at the Warren County Recorder's Office, 35 Commercial Way pictured above was purchased by COLEMAN CAPITAL, INC. on December 12, 2012 for $319,000.00. The majority of the funds to purchase this property can be traced to the WMA ENTERPRISES, LLC PNC Account #8143, the main account where investor funds were deposited and wired into.

(B) On November 19 and 21, 2012, $5,000.00 and $25,000.00 were transferred from PNC Account #8143 in the name of WMA ENTEPRISES, LLC to PNC Account #8119 in the name of COLEMAN CAPITAL, INC.

(C) On November 21, 2012 checks #30601 and 30602 made payable to Laurito & Laurito were drawn on the COLEMAN CAPITAL INC. PNC Account #8119 in the amounts of $25,000.00 and $5,000.00 respectively.

(D) On December 10, 2012, $244,000.00 was transferred from the WMA ENTERPRISES, LLC Account #8143 to COLEMAN CAPITAL INC.'s PNC Account #8119.

(E) On December 10, 2012, $244,000.00 was withdrawn by REBEKAH FAIRCHILD and converted into PNC cashier's check #856693 in the amount of $244,000 payable to Beverly Laurito.  The remitter on the check is listed as CONNIE APOSTELOS.

(2) **168 acres on S Houston Pike, South Vienna Ohio for $1,010,000.00;**



(A) According to records from the Clark County Recorder's Office, on June 21, 2013, APOSTELOS purchased the farm on Houston Pike in South Vienna, Ohio pictured above for $1,010,000.00.  APOSTELOS purchased the farm from Heidi (nee Hook) Black and John Hook;

(B) On July 24, 2013, APOSTELOS quit claim deeded the property for $0.00 to the WMA Trust, with STEVEN SCUDDER as the trustee.  The county records do not show a mortgage on this property;

(C) Rent payments were being deposited into WMA ENTERPRISES' PNC Account #8143 and MIDWEST GREEN RESOURCES' PNC Account #8135.  One check, made payable to WILLIAM APOSTELOS, was deposited into the WMA ENTERPRISES' PNC Account #8143 on May 13, 2013 from Rittenhouse Farms in the amount of $9,000.00.  The Memo line reflects the notation "Rent on Hook Farm – Apostelos".

(D) Upon analyzing PNC Bank Account #8143 in the name of WMA
ENTERPRISES, LLC, SA Laurel Vant could find no large payment to the seller Heidi Black in
the months preceding the purchase of the farm to pay the $1,010,000,00 sales price.  SA Vant did
see many payments out of WMA ENTERPRISES LLC'S PNC Account #8143 to Heidi Black
starting as early as November 2012, such as check #21847 for $9,324.00, annotated as an
"interest payment".   Due to the lack of any large payments to Heidi Black, the "interest
payments" made to Heidi Black prior to the sale of the farm, and the checks ranging from
$3,000.00 to $10,000.00 paid to Black before and after the sale of the property, it is believed that
Heidi Black is another investor.  APOSTELOS or one of his business entities wrote a promissory
note on October 29, 2014, to purchase the farm. During the search warrant at 35 Commercial
Way in Springboro, an Agreement to purchase the real estate on Houston Pike in South Vienna
Ohio, was discovered on CONNIE APOSTELOS' desk.  This agreement contains a promissory
note from purchaser, WILLIAM APOSTELOS, to seller, Heidi Black as Trustee of the John
Hook Revocable Trust, in the amount of $1,010,000.00 with 20% interest.  The agreement is
signed by WILLIAM APOSTELOS, and is notarized by REBEKAH FAIRCHILD.

    c.    **VEHICLES**

(1) a 2012 Ford F350 Pickup Truck, VIN: 1FT8W3DTXCEC81383 in the name
of COLEMAN CAPITAL, INC. on September 12, 2012 for $63,720.00 from Beau Townsend
Ford. There is a lien with Ford Motor Credit Company.



(2)    a 2012 Lincoln Navigator 2012 Lincoln Navigator VIN:
5LMJJ3J59CEL08992 purchased in the name of APOSTELOS ENTERPRISES, INC. on
January 12, 2013 for $65,845.00 from Beau Townsend Ford Inc. There is a lien with Lincoln
Automotive Financial Services.



(3)    the  2012 Lexus LS 460 VIN: JTHCL5EF5C5013783 pictured below was
purchased on March 27, 2012 by CONNIE APOSTELOS for $74,200.00 from Lexus of
Dayton.  There is a lien on this vehicle with Toyota Motor Credit Corp.  There were payments
made out of the various PNC business bank accounts to T.M.C.C. in the amount of $2,263.00.



(4)    a 2008 BMW M3 convertible VIN: WBSWL93548PL89282 was purchased by WILLIAM APOSTELOS on December 26, 2008 in the amount of $73,573.00 from Evans Motorworks, and was transferred to CONNIE APOSTELOS on March 26, 2014 for $0.00;



d.    **RACE HORSES**

(1)    a race horse pictured below named BARYSHNIKOV owned by CONNIE APOSTELOS and/or SLVER BRIDLE RACING LLC;





        (2)      a race horse named BERN LEGACY owned by CONNIE APOSTELOS, pictured below in the winner's circle with WILLIAM APOSTELOS and CONNIE APOSTELOS; and



(3)      a race horse named SHANON NICOLE pictured below owned by CONNIE APOSTELOS;



57.      On October 29, 2014, agents from the FBI, IRS and Department of Labor along with officers from the State Department of Commerce, Ohio BCI, the Springboro Police Department executed federal search warrants at 35 Commerce Way in Springboro, and the residence of APOSTELOS in Springboro.

58.      During the search, officers located many promissory notes executed between victims and APOSTELOS and/or the companies he controls.  It appears that APOSTELOS would get money from victims, often out of their retirement account, and quickly after investing that money, or sometimes failing to invest that money, APOSTELOS would transfer the money to earlier investors as a return on their investments.  During the investigation and search, it appears that APOSTELOS used most of the investors' money to pay off earlier investments, or to fund his glamourous lifestyle.

59.    Among the bank accounts, vehicles, cash and jewelry seized yesterday, officers seized a six foot stallion that appears to resemble Baryshnikov.





60.     Seizure warrants for the following assets were obtained on October 28, 2014:

(1)  Key Bank Account #9796 in the name of WMA ENTERPRISE, LLC with WILLIAM APOSTELOS and REBEKAH FAIRCHILD as the signors (all remaining contents);

(2)  Key Bank Account #9788 in the name of MIDWEST GREEN RESOURCES LLC with WILLIAM APOSTELOS and REBEKAH FAIRCHILD as the signors (all remaining contents);

(3)  J.P. Morgan Chase Bank Account #8300 in the names of WILLIAM M. APOSTELOS or CONNIE M. APOSTELOS (all remaining contents);

(4)  J.P. Morgan Chase Bank Account #1858 in the name of APOSTELOS ENTERPRISES, INC. (all remaining contents);

(5)  2008 BMW M3 Convertible with VIN: WBSWL93548PL89282 in the name of CONNIE APOSTELOS;

(6)  2012 Lincoln Navigator with VIN: 5LMJJ3J59CEL08992 in the name of APOSTELOS ENTERPRISES, INC.; and

(7)  2012 Ford 350 Pickup Truck with VIN: 1FT8W3DTXCEC81383 in the name of COLEMAN CAPITAL, INC.;

(8)  2012 Lexus LS 460 with VIN: JTHCL5EF5C5013783 titled to CONNIE APOSTELOS;

(9)  one Race Horse named BARYSHNIKOV owned by CONNIE APOSTELOS and/or SILVER BRIDLE RACING LLC;

(10)  one Race Horse named BERN LEGACY owned by CONNIE APOSTELOS; and

(11) one Race Horse named SHANON NICOLE owned by CONNIE APOSTELOS;

61.     The following vehicles were seized yesterday pursuant to seizure warrants:

a.      2008 BMW M3 Convertible with VIN: WBSWL93548PL89282 in the name of CONNIE APOSTELOS;

b.      2012 Lincoln Navigator with VIN: 5LMJJ3J59CEL08992 in the name of APOSTELOS ENTERPRISES, INC.; and

c.      2012 Ford 350 Pickup Truck with VIN: 1FT8W3DTXCEC81383 in the name of COLEMAN CAPITAL, INC.;

d.      2012 Lexus LS 460 with VIN: JTHCL5EF5C5013783 titled to CONNIE APOSTELOS;

62.     Arrangements are being made to seize and care for the horses.

63.     During the search, six new bank accounts were located.  It was also determined that the Key Bank Account #9676 in the name of WMA ENTERPRISE, LLC had the numbers transposed and it is actually #9796.

64.     The documents reveal that:

(1)  KeyBank account #1028 in the name of CONNIE APOSTELOS was funded with deposit on 4/14/14 for $15,000 check drawn on Horseshoe Casino;

(2)  Key Bank Account #9960 in the name of COLEMAN CAPITAL INC., has a balance of $8,012.75 and was funded with a deposit from the PNC COLEMAN CAPITAL Account #8119 on October 2, 2014 in the amount $29,543.40;

(3)  Key Bank Account #9978 in the name of COLEMAN CAPITOL INC. has a balance of $13,940.72 which was funded from:

(A) a deposit from J.P. Morgan Chase Bank Account #1858 in the name of APOSTELOS ENTERPRISES, INC. in the amount of $3,700 on 10/2/14;

(B) a deposit of a PNC Cashier's check in the name of COLEMAN CAPITAL, INC. Tax Account in the amount of $3,989.31 ON October 2, 2014;

(C) a deposit from J.P. Morgan Chase Bank Account #1858 in the name of APOSTELOS ENTERPRISES, INC. in the amount of $3,131.09 on October 10, 2014; and

(D) a transfer from Key Bank Account #9960 in the name of COLEMAN CAPITAL, INC. in the amount of $3,120.00 on October 24, 2014.

(4)  U.S. Bank Account #2934 in the name of SILVER BRIDLE RACING, LLC has a balance of $109,904.68 and was funded with:

(A) a deposit from Remington Park Casino on October 17, 2014 in the amount of $105,065.42; and

(B) a deposit from Jeffrey Columbro on October 14, 2014 in the amount of $4,000; and

(C) a deposit of PNC Official Check in the amount of $2,363.00 on October 14, 2014.

(5) U.S. Bank Account #3007 in the name of SILVER BRIDLE RACING, LLC, has a balance of $22,158.63 was funded with a deposit from CENTAUR ACQUISITION, LLC on September 23, 2014 in the amount of $44,000.00; and

(6) U.S. Bank Account #4687 in the name of CONNIE APOSTELOS has a balance of $1,599.75 was funded with a deposit from J.P. Morgan Chase Bank Account #1858 on October 14, 2014 in the amount of 10/10/14.

65. Additional seizure warrants for the following Bank Accounts were obtained October 30, 2014:

(1) Key Bank Account #9796 in the name of WMA ENTERPRISE, LLC with WILLIAM APOSTELOS and REBEKAH FAIRCHILD as the signors (all remaining contents);

(2) KeyBank account #1028 in the name of CONNIE APOSTELOS (all remaining contents);

(3) Key Bank Account #9960 in the name of COLEMAN CAPITAL INC., (all remaining contents);

(4) Key Bank Account #9978 in the name of COLEMAN CAPITOL INC.(all remaining contents);

(5) U.S. Bank Account #2934 in the name of SILVER BRIDLE RACING, LLC (all remaining contents)

(6) U.S. Bank Account #3007 in the name of SILVER BRIDLE RACING, LLC, (all remaining contents);

(7) U.S. Bank Account #4687 in the name of CONNIE APOSTELOS (all remaining contents);

66.    As of October 30, 2014, the number of victims has increased from approximately 160 victims to over 213 victims.

67.    During the execution of the search warrants, it was discovered that an Involuntary Chapter 7 Bankruptcy Petition was filed by three creditors who allege that WILLIAM APOSTELOS owes them approximately $5,222,082.81.

68.    Based on the above,

a.    there is probable cause to believe WILLIAM M. APOSTELOS, CONNIE M. APOSTELOS, REBEKAH FAIRCHILD, and others committed the following violations:

(1)  18 U.S.C. § 1343 (Wire Fraud);

(2)  18 U.S.C. § 371 (Conspiracy);

(3)  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud);

(4)  18 U.S.C. § 1956 (Money Laundering);

(5)  18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and

(6)  18 U.S.C. § 1957 (Laundering Monetary Instruments in Excess of $10,000); and

b.    the following assets:

(1)    All right title and interest (including any leasehold interest) in the whole of any lot or tract of land and any improvements or appurtenances, to the real property commonly known as **35 Commercial Way, Springboro, Ohio**; and



(2)      All right title and interest (including any leasehold interest) in the whole of any lot or tract of land and any improvements or appurtenances, to the real property commonly known as **496 South Houston Pike, South Vienna Ohio;**



c.      are subject to forfeiture pursuant to:

(1)  18 U.S.C. § 981(a)(1)(C)(civil forfeiture) as property, real or personal which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (Wire Fraud) or any offense constituting "specified unlawful activity" ("SUA") as defined in 18 U.S.C. § 1956(c)(7) which includes 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (Laundering SUA Proceeds in Excess of $10,000.00); or a conspiracy to commit such offense; and/or

(2)  18 U.S.C. § 981(a)(1)(A)(civil forfeiture) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957, or any property traceable to such property.

Your Affiant further sayeth naught.

s/Michael Bush_____
Michael Bush
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 3rd day of November, 2014

s/Pamela M. Stanek_____
Pamela M. Stanek
Notary, My Commission Does Not Expire

Page **39** of 39

EXHIBIT B

P.P.# 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-000-008 ‡ -009



**McDougall - Marsh**
Land Surveyors
8529 Byers Road, Miamisburg, Ohio 45342
Tel: 937-847-2680 · Fax 937-847-2670

168.8048 acres
Hook Property

Situate in Virginia Military Survey #5999, Harmony Township, Clark County, Ohio. Being all of a 169.3 acre (by deed) parcel conveyed to John Hook, Revocable Trust, by O.R. 1790, Page 2064 of the Deed Records of Clark County, Ohio, and being a tract of land more particularly described as follows:

*All of the Plats and Deeds referenced hereon, are recorded in the Plat and Deed Records of Clark County, Ohio.*

Starting for reference at a railroad spike found at the centerline intersection of South Houston Pike and Wilson Road:

*Thence*, N 33°46'34"W, with the centerline of said South Houston Road, for a distance of 51.01 feet to a Mag nail set at the *True Point of Beginning*;

*Thence*, from said *True Point of Beginning*, N 33°46'34"W, continuing with the centerline of said South Houston Road, for a distance of 689.17 feet to a 5/8" iron pin set at the southwest corner of a 12.2 acre parcel conveyed to Harry E. Burnsworth, Jr. and Grace E. Kelly-Burnsworth by O.R. 1955, Page 74-76 and on the south line of V.M.S. #4480:

*Thence*, N 50°00'00"E, with the south line of said 12.2 acre parcel and the south line of said V.M.S. #4480, passing a fence post found at 7.00 feet and a capped "RE Hankison" iron pin found at 514.42 feet, for a total distance of 1060.02 feet to a 5/8" iron pin set:

*Thence*, N 85°02'54"E, for a distance of 175.24 feet to a 5/8" iron pin set:

*Thence*, N 13°17'00"W, for a distance of 167.97 feet to a capped "RE Hankison" iron pin found on the south limited access right-of-way line of U.S. Route 40:

*Thence* Northeasterly, with a curve to the left, with said limited access right-of-way line, having a radius of 5789.58 feet, an arc length of 352.72 feet, with a central angle of 3°29'26" and chord length of 352.67 feet which bears N 76°49'04"E, to a 5/8" iron pin set at a point of tangency at Station 1396+85.29/60.00 feet right of the centerline of said U.S. Route 40 east bound per ODOT right-of-way plans CLA. 40-24.31:

*Thence*, N 75°04'20"E, continuing with the south limited access right-of-way line of said U.S. Route 40, for a distance of 413.74 feet to a fence post found at Station 1400+99.50/60.00 feet right, per said ODOT right-of-way plans CLA. 40-24.31 and the northwest corner of a 151.77 acre parcel conveyed to William H. Olinger, III by O.R. 1498, Page 410:

*Thence*, S 05°21'04"E, with the west line of said 151.77 acre parcel, for a distance of 568.26 feet to a 5/8" iron pin set:

*Thence*, S 39°59'21"E, continuing with the west line of said 151.77 acre parcel, passing a fence post found at 3691.29 feet, for a total distance of 3691.73 feet to a 5/8" iron pin set on the north line of a 57.25 acre parcel conveyed to Olinger Farms, LLC. by O.R. 1735, Page 719-720 and on the north line of V.M.S. #4214:

*Thence*, S 49°37'45"W, with the north line of said 57.25 acre parcel and V.M.S. #4214, passing a 5/8" iron pin set at 1700.71 feet, for a total distance of 1720.71 feet to a Mag nail set at the southwest corner of said 57.25 acre parcel and in the centerline of said South Houston Pike:

*Thence*, N 40°41'57"W, with the centerline of said South Houston Pike, for a distance of 1641.52 feet to a railroad spike found:

*Thence*, N 39°33'56"W, continuing with the centerline of said South Houston Pike, for a distance of 1476.41 feet to a Mag nail set on the south line of a 4.410 acre parcel conveyed to Dana N. and Connie L. Andrews by O.R. 386, Page 20 and O.R. 1475, Page 468:

*Thence*, N 50°51'15"E, with the south line of said 4.410 acre parcel, passing a 5/8" iron pin found at 26.07 feet, a capped "RET" iron pin found at 483.19 feet, for a total distance of 671.42 feet to a "RET" iron pin found:

*Thence*, N 14°57'37"W, with the east line of said 4.410 acre parcel, for a distance of 396.66 feet to a 5/8" iron pin found:

*Thence*, S 70°04'57"W, with the north lines of said 4.410 acre parcel, a 1.875 acre parcel conveyed to Joseph and Stacy Patterson by O.R. 1843, Page 386, a 1.137 acre parcel conveyed to Lowell E. and Deloris E. Davis, Tr. by O. R. 1387, Page 2182, passing a capped "RET" iron pin found at 371.50 feet and fence post found at 851.75 feet, for a total distance of 882.82 feet to the *True Point of Beginning*, Containing 168.8048 acres of which 1.3118 acres are in right-of-way. Subject to all legal conditions, easements and right-of-ways pertaining to the premises herein described. This description prepared by McDougall - Marsh Land Surveyors. Based on a field survey made by same in April 2013, under the direct supervision of Thomas K. Marsh P.S. #7735. All iron pins set are 30" x 5/8" capped "7735." Bearings are based on the south line of Tract A, B, and C (N 50°00'00"E) as recorded in Survey Volume 20, Page 85 of the Survey Records of Clark County, Ohio.

*Thomas K. Marsh*

Thomas K. Marsh P.S. #7735

Date: **5/9/13**

STATE OF OHIO
THOMAS KEITH MARSH 7735
REGISTERED PROFESSIONAL SURVEYOR

APPROVED
Clark County Tax Map
PH
MAY 10 2013
26-58
☑ Legal Description
☑ Survey Plat / Lotsplit
☐ Subdivision / Annexation



**LOCATION OF RIGHT-OF-WAY AND EASEMENT**

Approximately Seven Hundred Seventy ( **770'** ) linear feet more or less being parallel to the southerly right of way of U.S. Hwy 40 / aka National Road in Clark County, State of Ohio in the Township of Harmony and being a part of the lands recorded in the Recorder's Office, Clark County, Ohio and being more particularly described as follows:

Parcel No. 1301505999000048 (fka 1301505999000009 and 1301505999000008)
Property Address: South Houston Pike, South Vienna, OH 45369
Instrument Reference Number: Official Record Inst. # 201300013649 or Official Records Book 2004, Page 717 County of Clark, State of Ohio.

Situate in Virginia Military Survey #5999, Harmony Township, Clark County, Ohio. Being all of a 169.3 acre (by deed) parcel conveyed to John Hook, Revocable Trust, by O.R 1790, Page 2064 of the Deed Records of Clark County, Ohio, and being a tract of land more particularly described as follows:

All of the Plats and Deeds referenced hereon, are recorded in the Plat and Deed Records of Clark County, Ohio.

Starting for reference at a railroad spike found at the centerline intersection of South Houston Pike and Wilson Road:

Thence, N 33°46'34"W, with the centerline of said South Houston Road, for a distance of 51.01 feet to a Mag nail set at the True Point of Beginning:

Thence, from said True Point of Beginning, N 33°46'34"W, continuing with the centerline of said South Houston Road, for a distance of 689.17 feet to a 5/8" iron pin set at the southwest corner of a 12.2 acre parcel conveyed to Harry E. Burnsworth, Jr. and Grace E. Kelly-Burnsworth by O.R 1955, Page 74-76 and on the south line of V.M.S. #4480:

Thence, N 50°00'00"E, with the south line of said 12.2 acre parcel and the south line of said V.M.S. #4480, passing a fence post found at 7.00 feet and a capped "RE Hankison" iron pin found at 514.42 feet, for a total distance of 1060.02 feet to a 5/8" iron pin set:

Thence, N 85°02'54"E, for a distance of 175.24 feet to a 5/8" iron pin set:

Thence, N 13°17'00"W, for a distance of 167.97 feet to a capped "RE Hankison" iron pin found on the south limited access right-of-way line of U.S. Route 40:

Thence Northeasterly, with a curve to the left, with said limited access right-of-way line, having a radius of 5789.58 feet, an arc length of 352.72 feet, with a central angle of 3°29'26" and chord length of 352.67 feet which bears N 76°49'04"E, to a 5/8" iron pin set at a point of tangency at Station 1396+85.29/60.00 feet right of the centerline of said U.S. Route 40 east bound per ODOT right-of- way plans CLA 40-24.31:

Thence, N 75°04'20"E, continuing with the south limited access right-of-way line of said U.S. Route 40, for a distance of 413.74 feet to a fence post found at Station 1400+99.50/60.00 feet right, per said ODOT right-of-way plans CLA 40-24.31 and the northwest corner of a 151.77 acre parcel conveyed to William H. Olinger, III by O.R. 1498, Page 410:

Thence, S 05°21'04"E, with the west line of said 151.77 acre parcel, for a distance of 568.26 feet to a 5/8" iron pin set:

Thence, S 39°59'21"E, continuing with the west line of said 151.77 acre parcel, passing a fence post found at 3691.29 feet, for a total distance of 3691.73 feet to a 5/8" iron pin set on the north line of a 57.25 acre parcel conveyed to Olinger Farms, LLC. by O.R 1735, Page 719-720 and on the north line of V.M.S. #4214:

Thence, S 49°37'45"W, with the north line of said 57.25 acre parcel and V.M.S. #4214, passing a 5/8" iron pin set at 1700.71 feet, for a total distance of 1720.71 feet to a Mag nail set at the southwest corner of said 57.25 acre parcel and in the centerline of said South Houston Pike:

Thence, N 40°41'57"W, with the centerline of said South Houston Pike, for a distance of 1641.52 feet to a railroad spike found:

Thence, N 39°33'58"W, continuing with the centerline of said South Houston Pike, for a distance of 1476.41 feet to a Mag nail set on the south line of a 4.410 acre parcel conveyed to Dana N. and Connie L. Andrews by O.R 386, Page 20 and O.R 1475, Page 468:

Thence, N 50°51'15"E, with the south line of said 4.410 acre parcel, passing a 5/8" iron pin found at 26.07 feet, a capped "RET" iron pin found at 483.19 feet, for a total distance of 671.42 feet to a "RET" iron pin found:

Thence, N 14°57'37"W, with the east line of said 4.410 acre parcel, for a distance of 396.66 feet to a 5/8" iron pin found:

Thence, S 70°04'57"W, with the north lines of said 4.410 acre parcel, a 1.875 acre parcel conveyed to Joseph and Stacy Patterson by O.R 1843, Page 386, a 1.137 acre parcel conveyed to Lowell E. and Deloris E. Davis, Tr. by 0. R 1387, Page 2182, passing a capped "RET" iron pin found at 371.50 feet and fence post found at 851.75 feet, for a total distance of 882.82feet to the True Point of Beginning, Containing 168.8048 acres of which 1.3118 acres are in right-of-way. Subject to all legal conditions, easements and right-of-ways pertaining to the premises herein described. This description prepared by McDougall - Marsh Land Surveyors. Based on a field survey made by same in April 2013, under the direct supervision of Thomas K. Marsh P.S. #7735. All iron pins set are 30" x 5/8" capped "7735." Bearings are based on the south line of Tract A, B, and C (N 50°00'00"E) as recorded in Survey Volume 20, Page 85 of the Survey Records of Clark County, Ohio.

**JS 44** (Rev. 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA

**DEFENDANTS**

Real Property known as: 35 Commercial Way, Springboro, Ohio 45066, et al.

**(b)** County of Residence of First Listed Plaintiff **Montgomery**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **Warren**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Pamela M. Stanek, Assistant United States Attorney, 600 Federal Building, 200 West Second Street, Dayton, Ohio 45402

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☒ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
18 U.S.C. 981(a)(1)(A) and (C)

Brief description of cause:
Civil Forfeiture

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE
11/03/2014

SIGNATURE OF ATTORNEY OF RECORD
**Pamela M. Stanek**

Digitally signed by Pamela M. Stanek
DN: cn=Pamela M. Stanek, c=US, o=U.S. Attorney's Office, email=pamela.stanek@usdoj.gov
Reason: I am approving this document
Date: 2008.01.10 09:30:53 -05'00'

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO 440 (5/85) Summons in a Civil Action

# United States District Court

SOUTHERN _____ **DISTRICT OF** _____ OHIO _____

UNITED STATES OF AMERICA

V.

REAL PROPERTY KNOWN AS
35 COMMERCIAL WAY,
SPRINGBORO, OH 45066, et al.

### SUMMONS IN A CIVIL ACTION

CASE NUMBER: 3:14CV381

TO: (Name and Address of Defendant)

Connie Apostelos
35 Commercial Way
Springboro, OH 45066

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

Pamela M. Stanek
Assistant U.S. Attorney
U.S. Attorney's Office
200 West Second Street
Federal Building, Room 600
Dayton, Ohio    45402

a Claim pursuant to Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure within thirty (30) days after the service of this Summons upon you, exclusive of the day of service, and an Answer or Motion under Rule 12 to the Complaint which is herewith served upon you, within twenty (20) days after the filing of your Claim.   If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

John P. Hehman
_____        _____
**CLERK**                                                          **DATE**

_____
**BY DEPUTY CLERK**

Case 3:14-cv-00381-TMR Doc #: 22 Filed: 11/18/14 Entered: 11/18/14 16:47:29 Page: 63 of 66
Document    Page 63 of 66
AO 440 (5/85) Summons in a Civil Action

# United States District Court

_____ SOUTHERN _____ **DISTRICT OF** _____ OHIO _____

UNITED STATES OF AMERICA

V.

REAL PROPERTY KNOWN AS
35 COMMERCIAL WAY,
SPRINGBORO, OH 45066, et al.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER: 3:14CV381

TO: (Name and Address of Defendant)

Coleman Capital, Inc.
c/o Statutory Agent, Connie Apostelos
35 Commercial Way
Springboro, OH 45066

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

Pamela M. Stanek
Assistant U.S. Attorney
U.S. Attorney's Office
200 West Second Street
Federal Building, Room 600
Dayton, Ohio    45402

a Claim pursuant to Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure within thirty (30) days after the service of this Summons upon you, exclusive of the day of service, and an Answer or Motion under Rule 12 to the Complaint which is herewith served upon you, within twenty (20) days after the filing of your Claim.   If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

John P. Hehman
_____
**CLERK**

_____
**DATE**

_____
**BY DEPUTY CLERK**

Case 3:14-cv-00381-TMR Doc #: 22 Filed: 11/18/14 Page: 64 of 66 PAGEID #: 54
Case: 3:14-cr-00038-TMR Doc #: 22 Filed: 11/18/14 Page: 64 of 66 PAGEID #: 54
Document    Page 64 of 66

AO 440 (5/85) Summons in a Civil Action

# United States District Court

SOUTHERN _____ **DISTRICT OF** _____ OHIO _____

UNITED STATES OF AMERICA

V.

REAL PROPERTY KNOWN AS
35 COMMERCIAL WAY,
SPRINGBORO, OH 45066, et al.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER: 3:14CV381

TO: (Name and Address of Defendant)

William Apostelos
35 Commercial Way
Springboro, OH 45066

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

Pamela M. Stanek
Assistant U.S. Attorney
U.S. Attorney's Office
200 West Second Street
Federal Building, Room 600
Dayton, Ohio    45402

a Claim pursuant to Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure within thirty (30) days after the service of this Summons upon you, exclusive of the day of service, and an Answer or Motion under Rule 12 to the Complaint which is herewith served upon you, within twenty (20) days after the filing of your Claim.   If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

John P. Hehman
_____
**CLERK**

_____
**DATE**

_____
**BY DEPUTY CLERK**

AO 440 (5/85) Summons in a Civil Action

# United States District Court

SOUTHERN _____ **DISTRICT OF** _____ OHIO _____

UNITED STATES OF AMERICA

V.

REAL PROPERTY KNOWN AS
35 COMMERCIAL WAY,
SPRINGBORO, OH 45066, et al.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER: 3:14CV381

TO: (Name and Address of Defendant)

David Zoellner, Successor Trustee
The WMA Trust Agreement dated 8/23/13
411 Walnut Street, Suite 4711
Green Cove Springs, FL 32043

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

Pamela M. Stanek
Assistant U.S. Attorney
U.S. Attorney's Office
200 West Second Street
Federal Building, Room 600
Dayton, Ohio   45402

a Claim pursuant to Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure within thirty (30) days after the service of this Summons upon you, exclusive of the day of service, and an Answer or Motion under Rule 12 to the Complaint which is herewith served upon you, within twenty (20) days after the filing of your Claim.   If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

John P. Hehman
_____     _____
**CLERK**                                                                  **DATE**

_____
**BY DEPUTY CLERK**

# United States District Court

_____SOUTHERN_____ **DISTRICT OF** _____OHIO_____

UNITED STATES OF AMERICA

V.

REAL PROPERTY KNOWN AS
35 COMMERCIAL WAY,
SPRINGBORO, OH 45066, et al.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER: 3:14CV381

**TO:** (Name and Address of Defendant)

AT&T
Right of Way Department
3450 Riverwood Parkway, SE Room 162
Atlanta, GA 30339

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

Pamela M. Stanek
Assistant U.S. Attorney
U.S. Attorney's Office
200 West Second Street
Federal Building, Room 600
Dayton, Ohio    45402

a Claim pursuant to Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure within thirty (30) days after the service of this Summons upon you, exclusive of the day of service, and an Answer or Motion under Rule 12 to the Complaint which is herewith served upon you, within twenty (20) days after the filing of your Claim.   If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

John P. Hehman
_____
**CLERK**

_____
**DATE**

_____
**BY DEPUTY CLERK**